## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| v. | : | |
| | : | |
| MARK JOHNSON, | : | |
| MARC MANOFF, | : | |
| KYLE GOTSHALK, | : | |
| LEONARD GOTSHALK and, | : | |
| EXIT ONLY, INC., | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.      This case involves an illegal scheme to manipulate the stocks of two publicly traded companies, Exit Only, Inc. ("EXTO") and CX2 Technologies, Inc. ("CXTO"), from at least January 2008 through March 2008.

2.      To effectuate their scheme, Mark Johnson, Marc Manoff, Kyle Gotshalk, and Leonard Gotshalk (the "Individual Defendants"): a) entered into illegal agreements to orchestrate trading activity; b) engaged in, directed, or caused manipulative and deceptive securities transactions, and c) coordinated trading activity with the issuance of EXTO and CXTO press releases to provide a false pretext for the increased trading volume in EXTO and CXTO.   During the relevant time period, Kyle Gotshalk was EXTO's President, Chief Executive Officer, and a member of the Board of Directors.  Kyle Gotshalk and his father, Leonard Gotshalk, were major shareholders of both EXTO and CXTO.

3.      The Individual Defendants entered into agreements with persons they believed were corrupt individuals who would cause purchases of stock in exchange for cash kickback payments. In reality, these persons were a Cooperating Witness ("CW") who was, at all relevant times, cooperating with the Federal Bureau of Investigation ("FBI"), and an Undercover FBI Agent ("UA").

4.      Pursuant to the illegal agreements and Defendants' scheme, the FBI purchased over 500,000 shares of EXTO stock and Leonard Gotshalk paid two $1,500 kickbacks to an FBI-controlled account.   In addition, the FBI purchased 39,000 shares of CXTO stock in accordance with this scheme, but the Defendants reneged on their agreement to pay the cash kickback.

5.      Defendants designed and intended their scheme to create the false appearance of an active and liquid market, induce public purchases of stock, and ultimately increase the stocks' trading prices.

## VIOLATIONS

6.      As a result of the conduct described in this Complaint, the Defendants violated, and unless restrained and enjoined by the Court will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking permanently to enjoin Defendants from engaging in the acts, practices and courses of business alleged in this Complaint.

8.      The Commission seeks a final judgment ordering the Individual Defendants to disgorge their ill-gotten gains, with prejudgment interest thereon.

9.      The Commission seeks a final judgment ordering the Individual Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

10.     The Commission seeks a penny stock bar pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] against the Individual Defendants.

11.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

12.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of Pennsylvania.  For example, the kickbacks paid by Leonard Gotshalk were deposited into a bank account controlled by the FBI in the Eastern District of Pennsylvania.

13.     Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices and courses of business alleged in this Complaint.

## RELEVANT PERSONS AND ENTITIES

14.     Mark Johnson, age 41, is a resident of Baltimore, Maryland.  At all relevant times, he was a stock promoter and former registered representative at a broker-dealer.  In 1994, he was terminated from his employment at the broker-dealer.  Subsequent to his termination, the National

Association of Securities Dealers ("NASD"), which is now known as the Financial Industry
Regulatory Authority ("FINRA"), suspended his securities licenses for failing to respond to its
inquiry into his conduct.

15.     Marc Manoff, age 47, resides in Wayne, Pennsylvania.  At all relevant times, he was
an attorney licensed in the Commonwealth of Pennsylvania and had been practicing law for more
than twenty years.  He was a solo practitioner.  He was also a principal of Marck Capital Partners,
LLC.

16.     Kyle Gotshalk, age 36, resides in Canyon Country, California.  At all relevant times,
Kyle was the President and CEO, and a member of the Board of Directors of EXTO.

17.     Leonard Gotshalk, age 61, resides in Ashland, Oregon.  Leonard is the father of Kyle
Gotshalk.  In 1995, Leonard was permanently enjoined from violating the antifraud provisions of
the Securities Act and the Exchange Act for participating in the dissemination of false and
misleading press releases and other information about a company for which he served as an officer.
Gotshalk and others released this false information in conjunction with arranged sales of company
stock by an investor group formed by some of Leonard's co-officers.

18.     At all relevant times, EXTO was a Nevada corporation headquartered in Santa
Monica, California.  It owned and operated Text4cars.com, an online vehicle advertising website
that purports to connect buyers and sellers of vehicles via text messages.  EXTO's securities were
quoted on the Pink Sheets, which is operated by Pink OTC Markets, Inc. ("Pink Sheets") under the
symbol "EXTO" and had never been registered with the Commission.

19.     At all relevant times, CXTO was a Nevada Corporation headquartered in Boca
Raton, Florida.  The company was purportedly engaged in the operation and sale of digital wireless
data communications technologies in both the commercial and public safety areas.  CXTO's

securities were dually quoted on the Over-The-Counter-Bulletin-Board and Pink Sheets under the symbol "CXTO" and were registered with the Commission. In CXTO's Form 10-Q for the quarter ended September 30, 2008, the company reported assets of $174,138, revenues of $31,151, and a net loss of $120,891, for the quarter.

## FACTS

### Background

20.     At all relevant times, EXTO and CXTO qualified as penny stocks as defined by Rule 3a51-1 of the Exchange Act, and did not meet any exceptions to that Rule.

21.     At all relevant times, Kyle and Leonard Gotshalk each owned and/or controlled significant amounts of EXTO and CXTO stock.

22.     At all relevant times, EXTO acted by and through Kyle Gotshalk and he had the ability to control EXTO, including the content and timing of press releases.

### The Fraudulent Scheme

23.     As noted above, defendants Johnson, Manoff, Kyle Gotshalk and Leonard Gotshalk, together orchestrated and effectuated a scheme to manipulate the stock prices of two publicly traded companies, EXTO and CXTO.

24.     On or about January 23, 2008, defendants Johnson and Manoff met with the CW in Wayne, Pennsylvania to discuss manipulating publicly traded stocks. The CW offered to introduce them to an individual who could help them manipulate stocks by generating market purchases. The CW explained this person would – in exchange for cash payments – pay bribes to brokers who would then buy stock through unauthorized purchases in customer accounts. In reality, this individual, the UA, was an undercover Special Agent of the FBI.

25.     At all times, during communications with the CW and the UA, Johnson and Manoff were acting on behalf of and in conjunction with Kyle and Leonard Gotshalk, who were aware of, and approved of, the actions and communications of Johnson and Manoff.

26.     On or about February 25, 2008, the CW introduced Johnson and Manoff to the UA at a meeting in Philadelphia, Pennsylvania.  During the meeting, Johnson and Manoff proposed a multi-tiered "program" for manipulating EXTO and CXTO which included making cash payments to the UA in exchange for him causing retail purchases of stock and conducting promotional campaigns for the stocks.

27.     Johnson explained that he had been involved in other illegal manipulation schemes in the past.  As part of such schemes, he typically manipulated the stocks by issuing press releases, sending out promotional mailers, and by recruiting corrupt investor relations firms to tout the stocks. He also stated that in order to "get volume" in a stock one had to "create the news" and have "someone who sounds intelligent answering investor calls."

28.     Johnson further indicated during this meeting that his "program" would need a reliable person who could make "stair-step" purchases.  Stair-stepping is a manipulation technique involving the incremental purchase of stock that results in a slow price increase so as to avoid suspicion or detection.

29.     Johnson claimed that he only implemented this kind of "program" when he controlled management, had full access to transfer agents and shareholder lists, and could draft the press releases and direct when they would be issued.  The coordination of press releases with the purchases provides a plausible explanation for the large purchases in an otherwise thinly traded stocks so as to avoid detection or inquiry from law enforcement authorities.

30.     Johnson ended the meeting by stating that EXTO was the stock that was closest to "fruition" because he already controlled management, was preparing the news, and by the end of the week, would have the "NOBO lists."

31.     A "NOBO list", or "non-objecting beneficial owner's list", discloses to the issuer the names of beneficial owners who are not otherwise known to the issuer because these investors are not directly registered on the issuer's records.   A non-objecting beneficial owner means a person with beneficial ownership in a security who gives permission to a financial intermediary (usually a broker-dealer or bank) to release his name and address to the issuer of the security.   By providing such a list of shareholder information, Johnson was able to demonstrate both his connections to management, and his ability to track stock transactions.   The NOBO list gave Johnson the capability to track whether the corrupt brokers caused agreed-upon stock purchases.

32.     On or about March 7, 2008, Johnson contacted the UA to further discuss the plan to manipulate EXTO's stock.   Johnson told the UA that, in an effort to "stair-step" the stock, he wanted the undercover agent to purchase a total of $50,000 to $100,000 worth of EXTO in $10,000 increments, every other day, over the course of 12 to 15 days.   Johnson also explained that he would provide the UA with upcoming press releases and shareholder lists before the UA directed the purchases.   Johnson also told the UA that he would be paid 15 percent of the total value of stock he caused to be purchased, and that the cash kickback would be paid after each transaction.   After stair-stepping the stock, Johnson stated that the next phase in the program would be to tout the stock through a mail or telephone campaign.   Johnson projected that the entire "program" would last about six months.

33.     During that same conversation, Johnson claimed to have already inflated the price of EXTO stock from $0.04 to $0.07 per share through trading he orchestrated using accounts of family and friends, including Kyle and Leonard Gotshalk.

34.     Johnson also told the UA that EXTO's transfer agent provided him with shareholder information. The same day, Kyle Gotshalk e-mailed Johnson a spreadsheet identifying where almost all of the outstanding shares of EXTO were being held. This information is confidential, and not typically available to persons other than corporate officers and directors.

35.     On or about March 10, 2008, Johnson sent the UA two e-mails, one about EXTO, and one about CXTO.

36.     In the e-mail relating to EXTO, Johnson enclosed a EXTO shareholder list he had received from Kyle Gotshalk and eight nonpublic press releases prepared by Johnson relating to the company with projected release dates. EXTO publicly issued one of these releases on March 11, 2008. Among other things, this nonpublic information allowed Johnson to prove to the UA that he had strong connections to management and the ability to observe stock transactions in EXTO.

37.     In the e-mail relating to CXTO, Johnson enclosed a CXTO shareholder list and two nonpublic press releases that were prepared by Johnson, as well as titles of other nonpublic press releases, with projected release dates. CXTO publicly issued one of these releases on March 20, 2008. Among other things, this nonpublic information allowed Johnson to prove to the UA that he had strong connections to management and the ability to observe stock transactions in CXTO.

38.     Johnson contacted the UA on at least two other occasions to inquire when the UA wanted news released and told him that news would be released in conjunction with the UA's purchases of the stocks.

39.     On March 17, 2008, Johnson telephoned the UA and confirmed the agreement to make a cash payment to the UA in exchange for the UA bribing brokers to make retail purchases of EXTO and CXTO in customer accounts. Johnson agreed that the UA would be paid a kickback equal to 15% of the total value of stock purchased. Johnson also explained that the UA would be buying the EXTO stock from pre-arranged counterparties.

40.     That same day, Johnson told the UA that he was prepared to have EXTO and CXTO issue press releases in conjunction with the UA's purchases of the stocks.

41.     On or about March 20, 2008, Defendants caused EXTO to issue a press release in conjunction with the scheme. Shortly thereafter, Johnson told the UA about the press release.

42.     Pursuant to Johnson's instructions, the UA then caused purchases of 200,000 shares of EXTO stock at $.05 a share, at a total cost of approximately $10,000. These trades were made with FBI funds. Acting with advanced knowledge of the arranged purchases, Leonard Gotshalk, through an entity he controlled, placed orders in a manner that caused that entity to be the seller in the transactions orchestrated by the UA.

43.     On or about March 24, 2008, Manoff spoke to the UA and explained to him that Kyle and Leonard Gotshalk were he and Johnson's "partners in the deal" with Manoff and Johnson, and that Kyle and Leonard Gotshalk would be responsible for making the cash kickback payments to the UA in exchange for the UA generating purchases in EXTO and CXTO.

44.     That same day, Leonard Gotshalk caused approximately $1,500 to be wired to an account he believed was owned by the UA as a cash kickback for the purchases of EXTO stock that the UA had caused in conjunction with the scheme. The $1,500 was equal to 15% of the $10,000 in purchases, as Johnson and the UA had agreed. Unbeknownst to Leonard Gotshalk, he wired these funds to a bank account maintained by the FBI in Philadelphia, Pennsylvania.

45.    Also on or about March 24, 2008, at Johnson's direction, the UA caused additional purchases of approximately 217,021 shares of EXTO stock at $.046 a share, for a total cost of approximately $10,000. These trades were made with FBI funds.

46.    On or about March 26, 2008, Johnson, Kyle Gotshalk, Leonard Gotshalk, and the UA spoke on the telephone. During that call, they discussed manipulating EXTO and CXTO and the potential for "bigger" deals in the future. They also discussed plans to get EXTO "walked up" to as much as ten cents a share (which was double the current stock price) so that Kyle and Leonard Gotshalk could then sell their EXTO shares at a substantial profit. Kyle and Leonard also stated that they would not reveal to other shareholders that they were paying kickbacks to the UA to purchase EXTO stock.

47.    On or about March 27, 2008, Johnson spoke to the UA in order to obtain further wiring instructions for the next kickback payment.

48.    That same day, Leonard Gotshalk caused approximately $1,500 to be wired to an account he believed was owned by the UA as a kickback for the purchases of EXTO stock that the UA had caused in conjunction with the scheme. The $1,500 was equal to 15% of the $10,000 in purchases, as Johnson and the UA had agreed. Unbeknownst to Leonard Gotshalk, he wired these funds to a bank account maintained by the FBI in Philadelphia, Pennsylvania.

49.    At the direction of defendants, and as part of the continued scheme, on or about March 28, 2008, the UA caused purchases of EXTO stock. The UA caused purchases of approximately 104,000 shares of EXTO at approximately $.048 a share, for a total cost of approximately $4,992. These trades were made with FBI funds. Acting with advanced knowledge of the arranged purchases, Leonard Gotshalk, through an entity he controlled, placed orders in a manner that caused that entity to be the seller in the transactions orchestrated by the UA.

50.     On or about March 28, 2008, Johnson and the UA also spoke about manipulating CXTO stock. Johnson said he would lower the offer price of the stock to approximately $.13 per share so that the UA could get a better price on his purchases. Later that day, at the direction of the defendants, the UA caused purchases of approximately 39,000 shares of CXTO stock at approximately $.13 a share, at a total cost of approximately $5,070. These trades were made with FBI funds. Acting with advanced knowledge of the arranged purchases, Leonard Gotshalk, through an entity he controlled, placed orders in a manner that caused that entity to be the seller in the transactions orchestrated by the UA.

## FIRST CLAIM FOR RELIEF

## Violations of Section 17(a) of the Securities Act

51.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 50 inclusive, as if the same were fully set forth herein.

52.     As described in this Complaint, from at least January 2008 through March 2008, Defendants, knowingly or recklessly, directly or indirectly, in the offer and sale of securities, by the use of any means or instruments of transportation or communication in interstate commerce, or by the use of the mails:

        (a)     employed devices, schemes or artifices to defraud;

        (b)     obtained money or property by means of any untrue statements of a material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

        (c)     engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

53.    By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5, thereunder

54.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 53, inclusive, as if the same were fully set forth herein.

55.    From at least January 2008 through March 2008, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange:

(a)    employed devices, schemes or artifices to defraud;

(b)    made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

56.    By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

## I.

Permanently restraining and enjoining Exit Only, Inc., Johnson, Manoff, Leonard Gotshalk, and Kyle Gotshalk from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## II.

Ordering Johnson, Manoff, Leonard Gotshalk and Kyle Gotshalk to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

## III.

Ordering Johnson, Manoff, Leonard Gotshalk and Kyle Gotshalk to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C.§ 78u(d)(3)].

## IV.

Prohibiting Johnson, Manoff, Leonard Gotshalk, and Kyle Gotshalk from participating in any offering of penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## V.

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

_____ s/ Scott A. Thompson_____
Daniel M. Hawke
Elaine C. Greenberg
David S. Horowitz
Brendan P. McGlynn
G. Jeffrey Boujoukos
Scott A. Thompson (PA #90779)
Jennifer L. Crawford

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated:  September 24, 2010